**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, <u>et</u> <u>al</u>., | Chapter 11 |
| Debtors. | Jointly Administered |

| | |
|---|---|
| RESIDENTIAL CAPITAL, LLC; <u>et</u> <u>al</u>., | |
| Plaintiffs, | |
| v. | |
| UMB BANK, N.A., IN ITS CAPACITY AS INDENTURE TRUSTEE FOR THE 9.625% JUNIOR SECURED GUARANTEED NOTES, <u>et</u> <u>al</u>., | Adv. Case No. 13-01343 (MG) |
| Defendants. | |

| | |
|---|---|
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of the estate of the Debtors, | |
| Plaintiffs, | |
| v. | Adv. Case No. 13-01277 (MG) |
| UMB BANK, N.A., AS SUCCESSOR INDENTURE TRUSTEE UNDER THAT CERTAIN INDENTURE, dated as of June 6, 2008, <u>et</u> <u>al</u>., | |
| Defendants. | |

**NOTICE OF DEBTORS' AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS'**
**MOTION TO DISMISS CERTAIN OF THE DEFENDANTS' COUNTERCLAIMS**

**PLEASE TAKE NOTICE** that upon the undersigned's *Memorandum of Law in Support of the Debtors' and Official Committee of Unsecured Creditors' Motion to Dismiss Certain of the Defendants' Counterclaims* dated July 16, 2013, the *Declaration of Jamie A. Levitt in Support of the Debtors' and Official Committee of Unsecured Creditors' Motion to Dismiss Certain of the Defendants' Counterclaims* dated July 16, 2013 and the exhibit attached thereto, and all prior proceedings herein, Plaintiffs Residential Capital, LLC, GMAC Mortgage LLC, Residential Funding Company, LLC, and each of their affiliated debtors and debtors in possession, together with Plaintiff Official Committee of Unsecured Creditors, are moving this Court for entry of an order, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable by Rule 7012 of the Federal Rules of Bankruptcy Procedure, dismissing counterclaims 5-6, 7, 9, 22-25, and 26-30 of the *Answer, Affirmative Defenses, and Counterclaims of Defendants UMB Bank, N.A.* and *the Ad Hoc Group of Junior Secured Noteholders to Debtors' First Amended Complaint to Determine Extent of Liens and for Declaratory Judgment*, dated June 28, 2013 [Docket No. 14].

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will take place on **August 28, 2013 at 10:00 a.m. (Prevailing Eastern Time)**, or as soon thereafter as counsel may be heard, before the Honorable Martin Glenn, at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, Room 501.

**PLEASE TAKE FURTHER NOTICE** that any opposition to the relief sought herein must be made in writing, conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the Notice, Case Management, and Administrative Procedures approved by the Bankruptcy Court [Docket No. 141], be filed electronically by registered users of the Bankruptcy Court's electronic case filing system, and be

served, so as to be received no later than **July 30, 2013**, upon (a) counsel to the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attention: Gary S. Lee, Todd M. Goren, Jamie A. Levitt and Samantha Martin) and Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, NY 10178 (Attn: Steven J. Reisman, Theresa A. Foudy and Michael Moscato); (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004 (Attention: Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto); (c) the Office of the United States Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001 (Attention: US Attorney General, Eric H. Holder, Jr.); (d) Office of the New York State Attorney General, The Capitol, Albany, NY 12224-0341 (Attention: Nancy Lord, Esq. and Enid N. Stuart, Esq.); (e) Office of the U.S. Attorney for the Southern District of New York, One St. Andrews Plaza, New York, NY 10007 (Attention: Joseph N. Cordaro, Esq.); (f) counsel for Ally Financial Inc., Kirkland & Ellis LLP, 153 East 53rd Street, New York, NY 10022 (Attention: Richard M. Cieri and Ray Schrock); (g) counsel for the Official Committee of Unsecured Creditors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036 (Attention: Kenneth H. Eckstein, Gregory A. Horowitz and Douglas H. Mannal) and Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 36th Floor New York, NY 10017 (Attn: Robert J. Feinstein and John A. Morris).

**PLEASE TAKE FURTHER NOTICE** that if you do not timely file and serve a written objection to the relief requested in the Motion, the Bankruptcy Court may deem any opposition waived, treat the Motion as conceded, and enter an order granting the relief requested in the Motion without further notice or hearing.

Dated: July 16, 2013

MORRISON & FOERSTER LLP

 /s/ Gary S. Lee
Gary S. Lee
Todd M. Goren
Jamie A. Levitt
Samantha Martin
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900

-and-

CURTIS, MALLET-PREVOST, COLT
& MOSLE LLP

 /s/ Steven J. Reisman
Steven J. Reisman
Theresa A. Foudy
Michael Moscato
101 Park Avenue
New York, New York 10178
Telephone:  (212) 696-8860
Facsimile:  (212) 697-1559

*Counsel to the Debtors and
Debtors in Possession*

KRAMER LEVIN NAFTALIS
& FRANKEL LLP

 /s/ Kenneth H. Eckstein
Kenneth H. Eckstein
Gregory A. Horowitz
Douglas H. Mannal
1177 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000

-and-

PACHULSKI STANG ZIEHL &
JONES LLP

 /s/ Robert J. Feinstein
Robert J. Feinstein
John A. Morris
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777

*Counsel to the Official Committee of
Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

| | | |
|---|---|---|
| RESIDENTIAL CAPITAL, LLC; et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Adv. Case No. 13-01343 (MG) |
| UMB BANK, N.A., IN ITS CAPACITY AS INDENTURE TRUSTEE FOR THE 9.625% JUNIOR SECURED GUARANTEED NOTES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of the estate of the Debtors, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adv. Case No. 13-01277 (MG) |
| v. | ) | |
| | ) | |
| UMB BANK, N.A., AS SUCCESSOR INDENTURE TRUSTEE UNDER THAT CERTAIN INDENTURE, dated as of June 6, 2008, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OF LAW IN SUPPORT OF THE DEBTORS' AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION TO DISMISS CERTAIN OF THE DEFENDANTS' COUNTERCLAIMS

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...................................................................... 1

RELEVANT FACTUAL ALLEGATIONS ..................................................... 3

STANDARD OF REVIEW ............................................................................. 7

ARGUMENT .................................................................................................. 8

I.  COUNTERCLAIMS 7 AND 9, CLAIMING A LIEN ON PROCEEDS
    OR RECOVERIES PURPORTEDLY RESULTING FROM THE
    SETTLEMENT OF THE DEBTORS' PREPETITION CLAIMS,
    SHOULD BE DISMISSED AS A MATTER OF LAW. ..................................... 8

    A.  The JSNs Have No Lien on Avoidance Actions or the Proceeds
        Thereof. ........................................................................................... 9

    B.  The JSNs Have No Lien on Commercial Tort Claims. .......................... 12

II. COUNTERCLAIMS 22-25, CLAIMING A LIEN ON CERTAIN
    ASSETS DESPITE THE ACKNOWLEDGED RELEASES OF THOSE
    LIENS, SHOULD BE DISMISSED AS A MATTER OF LAW. ....................... 14

    A.  The Collateral Agent's Releases and UCC-3 Filings Should Be
        Enforced. ......................................................................................... 15

    B.  Even if the Liens Were Improperly Released by the Collateral
        Agent, the JSNs Still Do Not Have a Properly Perfected Equitable
        Lien. ................................................................................................ 18

III. COUNTERCLAIMS 26-30, CLAIMING THAT THE JSNS ARE
     ENTITLED TO REIMBURSEMENT FOR EVERY DOLLAR OF CASH
     COLLATERAL USED, SHOULD BE DISMISSED AS A MATTER OF
     LAW ....................................................................................................... 22

IV.  COUNTERCLAIMS 5 AND 6, CLAIMING A RIGHT TO
     POSTPETITION INTEREST AT THE CONTRACTUAL DEFAULT
     RATE, SHOULD BE DISMISSED AS A MATTER OF LAW. ........................ 27

CONCLUSION ............................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Ackoff-Ortega v. Windswept Pac. Entm't Co., Inc.*,
   120 F. Supp. 2d 273 (S.D.N.Y. 2000)..........................................................................15

*Barr v. Juniata Valley Bank (In re De Lancey)*,
   77 B.R. 424 (Bankr. S.D.N.Y. 1987)..........................................................................20

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)......................................................................................................8

*Big Yank Corp. v. Bank One Lexington, N.A. (In re Water Valley Finishing, Inc.)*,
   170 B.R. 831 (Bankr. S.D.N.Y. 1994)........................................................................20

*Cal. Chieftan v. Air Vt. Inc. (In re Air Vt., Inc.)*,
   761 F.2d 130 (2d Cir. 1985).......................................................................................20

*Cent. Vt. Pub. Serv. Corp. v. Herbert*,
   341 F.3d 186 (2d Cir. 2003).......................................................................................14

*Cordaro v. Cordaro*,
   18 A.D.2d 774 (N.Y. App. Div. 4th Dep't 1962) .......................................................21

*Crestar Bank v. Neal (In re Kitchin Equip. Co. of Va., Inc.)*,
   960 F.2d 1242 (4th Cir. 1992) ...................................................................................17

*Enron Corp. v. Granite Constr. Corp. (In re Enron Corp.)*,
   No. 03-93172 (AJG), 2006 Bankr. LEXIS 4650 (Bankr. S.D.N.Y. May 11,
   2006) .............................................................................................................................7

*Gaffney v. United States DOT (In re Premier Airways, Inc.)*,
   No. 02-1238 B, 2004 Bankr. LEXIS 5 (Bankr. W.D.N.Y. Jan. 6, 2004) ...................18

*Hartigan v. Pine Lake Vill. Apartment Co. (In re Pine Lake Vill. Apartment Co.)*,
   16 B.R. 750 (Bankr. S.D.N.Y. 1982).........................................................................24

*Hassett v. Revlon, Inc. (In re O.P.M. Leasing Servs., Inc.)*,
   23 B.R. 104 (Bankr. S.D.N.Y. 1982), *rev'd on other grounds*, 48 B.R. 824
   (S.D.N.Y. 1985).........................................................................................................20

*Helms v. Certified Packaging Corp.*,
   551 F.3d 675 (7th Cir. 2009) .....................................................................................12

*Hutson v. First-Citizens Bank & Trust Co. (In re Nat'l Gas Distribs., LLC)*,
No. 06-00031-8-AP, 2007 Bankr. LEXIS 4703 (Bankr. E.D.N.C. July 24,
2007) ..............................................................................................................................10

*In re 499 W. Warren St. Assocs., LTD. P'ship*,
142 B.R. 53 (Bankr. N.D.N.Y. 1992) ..........................................................................26

*In re 680 Fifth Ave. Assocs.*,
154 B.R. 38 (Bankr. S.D.N.Y. 1993) ...........................................................................25

*In re 785 Partners LLC*,
470 B.R. 126 (S.D.N.Y. 2012)......................................................................................27

*In re Bill Perhay Chevrolet, Inc.*,
172 B.R. 28 (Bankr. C.D. Ill. 1994)..............................................................................11

*In re Blackwood Assocs.*,
153 F.3d 61 (2d Cir. 1998)............................................................................................25

*In re Bownetree, LLC*,
No. 1-08-45854-dem., 2009 WL 2226107 (Bankr. E.D.N.Y. July 24, 2009) .............27

*In re Coventry Commons Assocs.*,
149 B.R. 109 (Bankr. E.D. Mich. 1992) .......................................................................27

*In re Gen. Auto Bldg., LLC*,
2012 Bankr. LEXIS 5931 (Bankr. D. Or. Dec. 28, 2012) ............................................26

*In re Hampton*,
No. 99-60376, 2001 Bankr. LEXIS 2060 (Bankr. M.D. Ga. Jan. 2, 2001) .................17

*In re KNM Roswell Ltd. P'ship*,
126 B.R. 548 (Bankr. N.D. Ill. 1991) ...........................................................................27

*In re Lease-A-Fleet, Inc.*,
152 B.R. 431 (Bankr. E.D. Pa. 1993) ...........................................................................10

*In re Northwest Airlines Corp.*,
No. 05-17930 (ALG), 2007 WL 3376895 (Bankr. S.D.N.Y. Nov. 9, 2007)...............28

*In re Overland Park Merch. Mart P'ship, L.P.*,
167 B.R. 647 (Bankr. D. Kan. 1994) ............................................................................10

*In re Pandeff*,
201 B.R. 865 (S.D.N.Y. 1996)......................................................................................18

*In re Pine Lake Vill. Apartment Co.*,
19 B.R. 819 (Bankr. S.D.N.Y. 1982)............................................................................24

*In re ProAlert, LLC*,
    314 B.R. 436 (B.A.P. 9th Cir. 2004)......................................................................26

*In re Salem Plaza Assocs.*,
    135 B.R. 753 (Bankr. S.D.N.Y. 1992) .................................................................24

*In re Silvernail Mirror & Glass, Inc.*,
    142 B.R. 987 (Bankr. M.D. Fla. 1992) .............................................................17, 19

*In re Sneijder*,
    407 B.R. 46 (S.D.N.Y. 2009) (Glenn, J.).............................................................18

*In re Tek-Aids Ind., Inc.*,
    145 B.R. 253 (Bankr. N.D. Ill. 1992) .................................................................11

*In re Vest Assocs.*,
    217 B.R. 696 (S.D.N.Y. Bankr. 1998) .................................................................28

*Ins. Co. of N. Am. v. Della Indus., Inc.*,
    998 F. Supp. 159 (D. Conn. 1998), *vacated on other grounds*, 229 F.3d 1135
    (2d Cir. 1999)......................................................................................................13

*James McKinney & Son, Inc. v. Lake Placid 1980 Olympic Games, Inc.*,
    92 A.D.2d 991, 461 N.Y.S.2d 483 (3d Dep't 1983) ...........................................15

*Koehring Co. v. Nolden (In re Pacific Trencher & Equip., Inc.)*,
    27 B.R. 167 (B.A.P. 9th Cir. 1983), *aff'd* 735 F.2d 362 (9th Cir. 1984)...................17

*Koppel v. 4987 Corp.*,
    167 F.3d 125 (2d Cir. 1999)..................................................................................8

*Labajo v. Best Buy Stores, L.P.*,
    478 F. Supp. 2d 523 (S.D.N.Y. 2007)...................................................................8

*Lis v. City Collector of N.Y.*,
    131 Misc. 2d 407 (N.Y. Sup. Ct. 1986) ..............................................................21

*M&T Mortg. Corp. v. Trosky (In re Trosky)*,
    371 B.R. 701 (Bankr. M.D. Pa. 2006) ........................................................18, 19, 21

*Mellon Bank (East), N.A. v. Glick (In re Integrated Testing Prods. Corp.)*,
    69 B.R. 901 (D.N.J. 1987) ..................................................................................11

*Myers v. First Source Fin., LLP (In re Demma Fruit Co.)*,
    2002 Bankr. LEXIS 1781 (Bankr. D. Neb. May 28, 2002) ..................................2, 10

*Papasan v. Allain*,
    478 U.S. 265 (1986)..............................................................................................8

*Press Access LLC v. 1-800 Postcards, Inc.,*
   11 Civ. 1905, 2011 U.S. Dist. LEXIS 143468 (S.D.N.Y. Dec. 13, 2011)....................5

*Qmect, Inc. v. Burlingame Capital Partners II, L.P.,*
   373 B.R. 682 (N.D. Cal. 2007) ...................................................................................23

*Rock Hill National Bank v. York Chem. Indus., Inc. (In re York Chem. Indus.,*
   *Inc.),*
   30 B.R. 583 (Bankr. D. S.C. 1983) ............................................................................18

*Rosenbaum v. Century Indem. Co. (In re Ultimite Corp.),*
   168 F.2d 917 (2d Cir. 1948)........................................................................................21

*S.E.C. v. Infinity Grp. Co.,*
   27 F. Supp. 2d 559 (E.D. Pa. 1998) ...........................................................................14

*Stein v. U.S. Farmers Home Admin. (In re Stein),*
   19 B.R. 458 (Bankr. E.D. Pa. 1982) ...........................................................................24

*Sunrise Indus. Joint Venture v. Ditric Optics, Inc.,*
   873 F. Supp. 765 (E.D.N.Y. 1995) .............................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007).......................................................................................................8

*Togut v. Wapnick (In re Karachi Cab Corp.),*
   21 B.R. 822 (Bankr. S.D.N.Y. 1982) ..........................................................................20

*Tow v. Rafizadeh (In re Cyrus II P'ship),*
   413 B.R. 609 (S.D. Tex. 2008) ...................................................................................14

*Troni v. Holzer,*
   09 Civ. 10239, 2010 U.S. Dist. LEXIS 79670 (S.D.N.Y. July 29, 2010) ....................5

*UFCW Local 174 Commercial Health Care Fund v. Homestead Meadows Foods*
   *Corp.,*
   No. 05 Civ. 7098 (DLC) 2005 WL 2875313 (S.D.N.Y. Nov. 1, 2005)......................14

*Vanston Bondholders Protective Comm. v. Green,*
   329 U.S. 156 (1946)....................................................................................................28

*Ward v. Bank of Granite (In re Hickory Printing Group, Inc.),*
   479 B.R. 388 (Bankr. W.D.N.C. 2012)..................................................................17, 19

**STATUTES**

11 U.S.C. § 363(e) ...........................................................................................................26

11 U.S.C. § 363(p)(2) .......................................................................................................23

11 U.S.C. § 506(c) ........................................................................24, 25, 26, 27

11 U.S.C. § 544(a) ...................................................................................20

11 U.S.C. § 544(b) ...................................................................................10

11 U.S.C. § 550 ...............................................................................2, 8, 9, 10

11 U.S.C. § 551 ...............................................................................2, 8, 9, 10

11 U.S.C. § 552 ...................................................................................8, 9

11 U.S.C. § 1107(a) .................................................................................20

U.C.C. § 9-102(a)(13) .............................................................................13

U.C.C. § 9-203(b)(3)(A) ..........................................................................13

U.C.C. § 9-509(d) ...................................................................................16

## OTHER AUTHORITIES

4 *Collier on Bankruptcy* ¶ 506.03[7][a][iv] (15th ed. rev. 2001) .....................23

10 *Collier on Bankruptcy* ¶ 552.02[5][d] (15th ed. 2008) ..............................12

1 *Modern Tort Law: Liability and Litigation* § 2:1 (2d ed. 2008) .....................13

*Black's Law Dictionary* 1626 (Deluxe 9th ed. 2009) .....................................13

Fed. R. Bankr. P. 7012(b) ...........................................................................8

Fed. R. Civ. P. 12(b)(6) ...........................................................................1, 8

Plaintiffs Residential Capital, LLC ("ResCap"), GMAC Mortgage LLC ("GMACM"), Residential Funding Company, LLC ("RFC"), and each of their affiliated debtors and debtors-in-possession (collectively, the "Debtors"), together with Plaintiff the Official Committee of Unsecured Creditors (the "Committee" and, collectively with the Debtors, "Plaintiffs") submit this memorandum of law in support of their motion to dismiss (the "Motion") certain of the counterclaims asserted in the Answer, Affirmative Defenses, and Counterclaims of Defendants UMB Bank, N.A. ("UMB") and the Ad Hoc Group of Junior Secured Noteholders (the "JSNs") to Debtors' First Amended Complaint to Determine Extent of Liens and for Declaratory Judgment, dated June 28, 2013.

## PRELIMINARY STATEMENT

The Debtors' and Committee's Joint Chapter 11 Plan, dated July 3, 2013 (the "Plan"), provides for payment in full of the JSNs' allowed claims, including postpetition interest and other reasonable charges authorized under the JSN Indenture if and to the extent the JSNs are determined to be oversecured. The parties are therefore seeking the Court's assistance in determining the nature, extent, and priority of the JSNs' liens. While there are some factual issues relevant to that determination, key issues at the heart of the parties' dispute are entirely legal in nature and can be resolved through motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Rulings on these legal issues will narrow the areas of dispute, potentially enabling the parties to reach a settlement or, failing that, expediting the forthcoming Phase I trial and Confirmation Hearing.

By this Motion, then, Plaintiffs seek dismissal of counterclaims asserting several of the JSNs' most aggressive and overreaching arguments.

First, well-established principles of law bar the JSNs' asserted liens on avoidance actions and commercial tort claims belonging to the Estates—and, by extension, any asserted lien on the Ally Contribution. Estate avoidance actions cannot be subject to prepetition liens because such actions do not exist prior to bankruptcy; they arise solely out of the Bankruptcy Code, including the trustee's power to bring actions that, prepetition, an unsecured creditor could have brought under state law. Under sections 550 and 551 of the Bankruptcy Code, avoidance actions and their fruits are preserved "for the benefit of the estate," free from any prepetition encumbrances. Moreover, avoidance actions are a species of commercial tort claims, and by the express terms of the security agreement, as well as the requirements of the Uniform Commercial Code, the JSNs have no valid lien on commercial tort claims.

Second, the JSNs' contention that *their own Collateral Agent* improperly released certain collateral, even if true (which it is not), fails to state a valid cause of action against the Debtors. There is only one fact relevant to Plaintiffs' motion to dismiss the JSNs' causes of action challenging the releases, and it is not disputed: the Collateral Agent did in fact release the relevant collateral and filed UCC-3 amended financing statements reflecting such releases. If these releases were improper, the JSNs may have a claim against the Collateral Agent, but they cannot reverse the effectiveness of the releases nor are they entitled to the grant of any equitable liens. And even if they did have a right to an equitable lien, the lien would be unperfected and subject to avoidance as a matter of law.

Third, the JSNs' adequate protection theory, claiming that they are entitled to be reimbursed for every dollar of their Cash Collateral[1] that has been used in accordance with the express terms of the Cash Collateral Orders (to which the JSNs consented), turns established law

_____

[1] "Cash Collateral" means the cash collateral (as defined in the AFI/JSN Cash Collateral Order) of the JSNs under the Junior Secured Notes.

on its head.  Adequate protection is available only if, and to the extent that, the total value of the secured creditor's collateral has diminished during the adequate protection period.  The erroneous "dollar for dollar" adequate protection theory the JSNs advance in their counterclaims should be dismissed as a matter of law.  A ruling on the governing standard for adequate protection at this stage will reduce the distance between the parties, and facilitate rational evidentiary presentations at trial.

Finally, even if the JSNs were oversecured, they would not be entitled to default rate interest.  Courts within this Circuit consistently deny default rate interest to oversecured creditors where the debtor is insolvent and granting default rate interest would diminish unsecured creditor recoveries, as indisputably would happen here.  As there are no facts in dispute relevant to this issue, it is ripe for decision at this stage.

**RELEVANT FACTUAL ALLEGATIONS**

In this adversary proceeding, Plaintiffs seek to determine (a) the extent of the liens securing the 9.625% Junior Secured Guaranteed Notes due 2015 issued by Debtor ResCap (the "Notes" or the "Junior Secured Notes")[2], (b) whether the JSNs are oversecured creditors and thus entitled to postpetition interest, and (c) the appropriate rate for such interest, in the event the JSNs are entitled to it.  UMB and the JSNs collectively assert that they had a secured claim in the amount of $2.223 billion as of the Petition Date, including principal and accrued prepetition interest.  In fact, the value of the collateral securing the Notes is approximately $1.69 billion (subject to adjustments based on the ultimate value received in a sale of the JSNs' collateral and

---

[2] The Notes were issued under the Indenture dated as of June 6, 2008 among ResCap, as issuer, each of the guarantors, and U.S. Bank National Association, a national banking association ("U.S. Bank"), as the original indenture trustee (the "JSN Indenture").  A copy of the JSN Indenture is annexed as Exhibit 1 to the Debtors' *First Amended Complaint to Determine Extent of Liens and for Declaratory Judgment* [Docket No. 8] (the "Amended Complaint").  Defendant UMB Bank, N.A. subsequently replaced U.S. Bank as successor indenture trustee.

depending on the allocation of expenses going forward)—a valuation that the Debtors are prepared to prove at the trial of this adversary proceeding, if necessary. For present purposes, however, Plaintiffs recite the following facts relevant to the counterclaims at issue in this Motion. This factual summary is taken from the JSNs' counterclaims, and the documents cited therein.

In June 2008, ResCap issued certain Notes to the JSNs under the JSN Indenture. (JSNs' Counterclaims ¶ 14.) On December 30, 2009, ResCap and certain of its affiliates entered into the Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of December 30, 2009 (the "<u>JSN Pledge Agreement</u>"), pursuant to which ResCap, GMACM, RFC, and certain other Debtor guarantors ostensibly granted or guaranteed "all-asset" liens in favor of the JSNs (including liens on general intangibles), subject to numerous exclusions and carve-outs that significantly limited the scope of the grant. (*See id.*, ¶ 18; JSN Pledge Agreement §§ 2-5 (attached as Ex. C to Adversary Complaint for Declaratory Judgment, Avoidance of Liens, and Disallowance of Claims [Docket No. 1] in Adv. Proc. No. 13-01277).)[3]

Whatever the scope of the liens in the JSN Pledge Agreement, the Agreement is clear about who had authority to release those liens. There can be no dispute that Defendant Wells Fargo Bank, N.A., in its capacity as third priority collateral agent and collateral control agent for the Notes ("<u>Wells Fargo</u>" or the "<u>Collateral Agent</u>") had such authority. The JSN Pledge Agreement granted "to the Third Party Collateral Agent"—or Wells Fargo—the security interests at issue. (JSN Pledge Agreement § 2, at 13.) Consistent with the JSN Pledge Agreement, the original Uniform Commercial Code ("<u>UCC</u>") financing statements recording the

---

[3] The scope of the liens granted in the JSN Pledge Agreement is the subject of a number of the claims and counterclaims in this action, but, with the exception of whether the liens cover commercial torts and avoidance actions, is not at issue in this motion to dismiss.

liens identified Wells Fargo as the secured party. (Copies of the UCC financing statements are attached to the accompanying Declaration of Jamie A. Levitt, dated July 16, 2013, as <u>Exhibit 1</u>.[4])

In late 2008, Ally Financial, Inc. ("<u>AFI</u>"), as initial lender and lender agent, executed a $430 million loan agreement with two ResCap subsidiaries as borrowers. (JSNs' Counterclaims ¶ 63.) In June 2009, AFI executed another $370 million loan agreement with two ResCap subsidiaries as borrowers. (*Id*.) On December 30, 2009, these two credit facilities were merged into the $1.1 billion AFI LOC.[5] (*Id*.)

Following the execution of the AFI LOC, the Collateral Agent released certain of the JSNs' liens on "significant assets that had been pledged . . . to support the Junior Secured Notes." (*Id*. at ¶ 64.) The releases included all Pledged Mortgage Loans, all Subject Mortgage Loans, and All Servicing Rights Collateral, among other assets (each as defined in the JSNs' Counterclaims). (*Id*.) As the JSNs acknowledge, all of the releases were executed by Defendant Wells Fargo Bank, N.A., in its capacity as Collateral Agent. (*Id*.) The Collateral Agent also filed UCC-3 amended financing statements removing the method by which the originally filed liens had been perfected. (*Id*.) Shortly thereafter, some or all of the released collateral was pledged to support the AFI LOC. (*Id*.) The JSNs do not allege—and they cannot allege—that they ever complained about or challenged the collateral releases before the Petition Date.

---

[4] Courts may, of course, consider UCC financing statements on a motion to dismiss. *See, e.g.*, *Press Access LLC v. 1-800 Postcards, Inc.*, No. 11 Civ. 1905, 2011 U.S. Dist. LEXIS 143468 (S.D.N.Y. Dec. 13, 2011) ("The Court has considered only the facts as asserted in the Complaint, which for the purpose of this motion [to dismiss] it assumes as true, along with" the following attachment, among others, "to the Complaint: a UCC Financing Statement . . . ."); *Troni v. Holzer*, No. 09 Civ. 10239, 2010 U.S. Dist. LEXIS 79670 (S.D.N.Y. July 29, 2010) ("For the purposes of this motion, this Court accepts the following allegations of the Complaint as true. . . . Holzer . . . signed one of the financing forms.") (citing to UCC Financing Statement).

[5] The "AFI LOC" is the $1.1 billion loan facility reflected by the Amended and Restated Loan Agreement, dated December 30, 2009, by and among RFC and GMACM, as borrowers, ResCap and certain other affiliates, as guarantors, and AFI, as agent and lender.

On May 14, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, and on May 16, 2012, the United States Trustee for the Southern District of New York appointed nine members to the Committee.

On the Petition Date, the Debtors filed a motion seeking to use cash collateral to continue operating their businesses, a request this Court granted on June 25, 2012. (*See Final Order Under Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis, (II) Authorizing the Debtors to Use Cash Collateral, and (III) Granting Adequate Protection to Adequate Protection Parties* [Docket No. 491] (the "AFI/JSN Cash Collateral Order").) On July 10, 2013, the Bankruptcy Court entered the *Stipulation and Order in Respect of the Debtors' Motion for Entry of an Order to Permit the Debtors to Continue Using Cash Collateral* [Docket No. 3374] [Docket No. 4193], which, among other things, set forth the limited terms on which the Debtors could continue using Cash Collateral and adjusted the adequate protection package granted to the JSNs and the other adequate protection parties (the "Revised AFI/JSN Cash Collateral Order", and together with the AFI/JSN Cash Collateral Order, the "Cash Collateral Orders"). The JSNs participated in the negotiation of the Cash Collateral Orders (and all extensions thereof), each of which was entered with the JSNs' consent.

The AFI/JSN Cash Collateral Order authorized the Debtors to use the JSNs' cash collateral "for the purposes detailed within the Initial 20-Week Forecast and each subsequent Forecast . . . ." (*Id.* ¶¶ 14-15.) In exchange, the AFI/JSN Cash Collateral Order granted the JSNs an adequate protection lien to the extent of any "aggregate diminution in value" of their collateral. (*Id.* § 16.) The parties dispute whether there has been any such diminution in value.

(JSNs' Counterclaims ¶¶ 71-77.) As detailed below, certain aspects of that dispute can be resolved as a matter of law.

On June 20, 2012, the Court directed that an examiner be appointed [Docket No. 454]. On July 3, 2012, the Court approved Arthur J. Gonzalez as the examiner (the "Examiner") [Docket No. 674], and on June 26, 2013, the *Report of Arthur J. Gonzalez, as Examiner* (the "Examiner's Report") was made publicly available [Docket No. 3698].[6]

On May 13, 2013, the Debtors, AFI, the Committee, and other claimants entered into a Plan Support Agreement, which contains a global settlement. (JSNs' Counterclaims ¶ 34.) Under the global settlement, in exchange for broad estate and third-party releases, AFI has agreed to pay $2.1 billion to the Debtors (the "Ally Contribution"). (*Id.*) The JSNs contend that their purported liens "entitle[] the JSNs to *any* proceeds or recoveries resulting from the settlement of prepetition claims or causes of actions belonging to the Borrower and the Debtor Guarantors." (*Id.* at ¶ 36 (emphasis added).) As detailed below, this contention can be resolved based purely on the law governing a creditor's entitlement—or rather, non-entitlement—to liens on a debtor's commercial tort claims and avoidance actions.

## STANDARD OF REVIEW

On a motion to dismiss, the Court may consider (i) the allegations in the complaint (or here, the counterclaims), (ii) exhibits attached to the pleading or incorporated by reference in the pleading, (iii) matters of which judicial notice may be taken, and (iv) documents of which the counterclaim plaintiffs have notice and on which they relied in bringing their claim or that are integral to their claim. *See, e.g.*, *Enron Corp. v. Granite Constr. Corp. (In re Enron Corp.)*, No. 03-93172 (AJG), 2006 Bankr. LEXIS 4650, at *10 (Bankr. S.D.N.Y. May 11, 2006) (citing

_____

[6] The Examiner's Report can be accessed at:
http://www.kccllc.net/rescap/document/1212020130513000000000009.

*Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Cortec Indus. v. Sum Holding, L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

When considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, the Court must accept the facts alleged in the counterclaims as true and draw all reasonable inferences in favor of the non-movant—here, the counterclaimants. *See Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). But a court is not required to accept a party's conclusory allegations where they are "clearly contradicted by documentary evidence incorporated into the pleadings by reference." *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 528 (S.D.N.Y. 2007). Nor is the Court bound to accept as true legal conclusions couched as factual allegations. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). Rather, the counterclaims must state "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations, citations, and alterations omitted).

## ARGUMENT

## I. COUNTERCLAIMS 7 AND 9, CLAIMING A LIEN ON PROCEEDS OR RECOVERIES PURPORTEDLY RESULTING FROM THE SETTLEMENT OF THE DEBTORS' PREPETITION CLAIMS, SHOULD BE DISMISSED AS A MATTER OF LAW.

The JSNs have no conceivable property right in avoidance actions or commercial tort claims. Avoidance actions are excluded from their collateral by virtue of sections 550, 551, and 552 of the Bankruptcy Code; commercial tort claims are excluded because such claims must be listed in security documents with specificity, and the JSN Pledge Agreement and related

financing statements failed to list any such claims.  Thus, the JSNs' seventh counterclaim, in

which they seek a declaration that the entire Ally Contribution is their collateral, regardless of

how much of the settlement is attributable to avoidance actions or commercial tort claims, and

their ninth counterclaim, in which they seek a declaration that all state law avoidance actions

belonging to any Debtor Obligor are part of their collateral, should be dismissed.  Even if it were

possible for the Court to conduct a mini-trial and attempt to rationally allocate the Ally

Contribution (and it is not), it is clear as a matter of law that the JSNs have no lien on proceeds

from avoidance actions or commercial tort claims.

> **A.  The JSNs Have No Lien on Avoidance Actions or the Proceeds Thereof.**

Under Bankruptcy Code sections 550, 551, and 552, proceeds of avoidance actions are

not subject to prepetition security interests.  Under section 552, property acquired by a debtor

after the commencement of its bankruptcy case is not subject to any lien resulting from

prepetition security agreements, except to the extent the property acquired postpetition

constitutes proceeds of the prepetition collateral.  *See* 11 U.S.C. §§ 552(a) & (b).  If the JSNs had

a valid perfected lien on a prepetition cause of action, that lien could potentially extend to

postpetition settlement proceeds from that claim (subject to tracing requirements or unless the

equities of the case dictated otherwise, as they would here).  But avoidance actions, even those

arising under state law, are *not* prepetition collateral, because they do not belong to the estate

outside of bankruptcy.  Fraudulent conveyance claims, including for example claims under the

Minnesota "Insider Preference" statute that the Examiner analyzed at length, can ordinarily be

brought only by creditors in the non-bankruptcy context.  (*See generally* Examiner's Report

Section VII.F.)  The power to bring such actions on behalf of the estate arises only by virtue of

the trustee's ability to assert the rights of unsecured creditors under section 544(b).[7]

Courts have therefore held that proceeds of avoidance actions are "after-acquired

property" and under section 552(a) are not subject to a prepetition security interest.  For

example, in *Myers v. First Source Fin., LLP (In re Demma Fruit Co.)*, 2002 Bankr. LEXIS 1781

(Bankr. D. Neb. May 28, 2002), the debtor granted a creditor a prepetition security interest in

certain actions arising out of a transaction.  After the filing, the trustee settled a fraudulent

conveyance action relating to that transaction, and the creditor asserted a lien on the settlement.

The bankruptcy court held that "[t]he debtor did not own the right to pursue a fraudulent transfer

action . . . , and therefore could not have encumbered or assigned that right[.]"  *Id.* at *11.  *See*

*also, e.g.*, *Hutson v. First-Citizens Bank & Trust Co. (In re Nat'l Gas Distribs., LLC)*, No. 06-

00031-8-AP, 2007 Bankr. LEXIS 4703, at *21−*22 (Bankr. E.D.N.C. July 24, 2007) (trustee's

recoveries under preferential transfer and fraudulent transfer theories constitute postpetition

property of the estate not subject to prepetition security interest); *In re Overland Park Merch.*

*Mart P'ship, L.P.*, 167 B.R. 647 (Bankr. D. Kan. 1994) (preference recoveries not covered by

prepetition lien); *In re Lease-A-Fleet, Inc.*, 152 B.R. 431 (Bankr. E.D. Pa. 1993) (same).[8]

Sections 550 and 551 supply an additional basis for excluding avoidance actions from the

scope of the JSNs' lien.  In providing that transferred property is recovered or preserved "for the

---

[7] Claims of third parties that never become property of the estate are, of course, likewise never subject to a secured creditor's lien.  Thus, to the extent a portion of the Ally Contribution were allocable to such claims, the JSNs would have no lien on such proceeds.

[8] By this same reasoning, a claim (whether arising in tort, in contract, or otherwise) that springs from the successful avoidance of a transaction also would be after-acquired property that belongs to the trustee, not to a secured creditor with prepetition liens.  For example, if the estates could avoid the "Second 2009 Tax Allocation Agreement" (as identified in Examiner's Report at p. I-13), thereby bringing the potentially valuable "First 2009 Tax Allocation Agreement" (*id.*) back into the estates, then any claims arising from that newly restored contract would be after-acquired property not subject to the liens of secured creditors.

benefit of the estate," those sections require that such property be distributed among the unsecured creditors rather than become subject to a secured creditor's lien, and courts have so held. *See, e.g., Mellon Bank (East), N.A. v. Glick (In re Integrated Testing Prods. Corp.)*, 69 B.R. 901, 903-04 (D.N.J. 1987) (amounts recovered under preference action relating to sale of collateral are not subject to prepetition lien on collateral); *In re Bill Perhay Chevrolet, Inc.*, 172 B.R. 28 (Bankr. C.D. Ill. 1994) (amounts recovered from preferential transfer are not subject to prepetition lien); *see also In re Tek-Aids Ind., Inc.*, 145 B.R. 253, 256 (Bankr. N.D. Ill. 1992) (holding that allowing secured creditors lien on preference recoveries "would not only defy logic, but would undermine the policy behind the avoidance powers as well").

With persuasive analysis, *Collier on Bankruptcy* fully supports the proposition that prepetition liens do not attach to funds recovered through avoidance actions, whether under state law or bankruptcy law and whether preferences or fraudulent conveyances:

> Once a bankruptcy [case commences] . . . , since all recoveries under the avoiding powers are property of the estate, administered almost exclusively by the trustee for the benefit of the estate as a whole rather than for any creditor individually, it is difficult to see how such recoveries can be other than "after-acquired property" within the meaning of section 552(a), rather than proceeds of prepetition collateral under section 552(b)(1). *This is true for fraudulent transfers as well as preferences, and no persuasive distinction seems possible along these lines.* Prebankruptcy state law preferences exist, and may be asserted postbankruptcy under section 544(b) of the Bankruptcy Code. And the assertion by a trustee of state fraudulent transfer law under section 544(b) allows for an expanded recovery under the rule of *Moore v. Bay*, as well as section 550, underscoring the fact that the recoveries that are property of the estate under section 541(a)(3) are peculiarly postpetition in nature. Indeed, a creditor may not sue to recover a state law fraudulent transfer once a case in bankruptcy is commenced, because this would be taking a chose in action from the estate, thereby violating the automatic stay. On the whole, therefore, *the more persuasively reasoned opinions do not permit [secured] creditors to share in recoveries obtained by bankruptcy trustees or estate representatives pursuant to the avoiding powers,*

> *even where such creditors may have independent, traceable rights*
> *to those funds.*

10 *Collier on Bankruptcy* ¶ 552.02[5][d] (15th ed. 2008) (citations omitted) (emphasis added).

Therefore, the JSNs' seventh and ninth counterclaims, as they relate to avoidance actions, should be dismissed.

### B.    The JSNs Have No Lien on Commercial Tort Claims.[9]

Under the UCC,[10] and, even more fundamentally, the language of the JSN Pledge Agreement, the JSNs have no lien on any commercial tort claims belonging to the Debtors. Moreover, because avoidance actions are merely a species of commercial torts, this is an additional independent reason to reject the JSNs' asserted lien on the proceeds of avoidance actions.

As an initial matter, the plain language of the JSN Pledge Agreement upon which the JSNs rely defeats their claim.  The agreement does *not* encompass commercial tort claims. Section 2(d) of that JSN Pledge Agreement grants the JSNs a lien only on "Commercial Tort Claims Described on Schedule V hereto" (*see* JSN Pledge Agreement § 2(d)), and the referenced Schedule V, in turn, contains a single word:  "None."  (*Id.* Schedule V.)   The financing statements filed by the JSNs similarly, if less eloquently, fail to specifically identify any commercial tort claims.  (*See* Ex. 1.)  By its terms, then, the JSN Pledge Agreement fails to grant the JSNs any lien on commercial torts.  *See Helms v. Certified Packaging Corp.*, 551 F.3d 675, 679 (7th Cir. 2009) (secured creditor had no lien on commercial tort claims when a security agreement defined such claims by reference to a blank schedule).

---

[9]  Pursuant to the stipulations in paragraph 5 of the AFI/JSN Cash Collateral Order, the arguments in this section are advanced by the Committee.

[10] The JSN Pledge Agreement defines UCC as "the Uniform Commercial Code as in effect from time to time in the State of New York . . . ."  (JSN Pledge Agreement §1, at p. 12.)

Even if the JSN Pledge Agreement had described commercial tort claims generically (*e.g.*, "all commercial tort claims")—which it did not—the JSNs would not have a valid lien on such claims under the requirements of the UCC. Section 9-108 of the UCC imposes rigorous rules for the listing of commercial tort claims, under which such claims cannot be described "only by type of collateral," *id.* § 9-108(e)(1), but instead must be described with "specificity." U.C.C. § 9-108 at cmt. 5.[11] The description "all tort claims" is insufficient to create a lien on commercial tort claims. *Id.* Neither the JSN Pledge Agreement nor the financing statements provide the specificity required to satisfy this standard.

The failure to list any commercial tort claims not only dooms the JSNs' arguments for a lien on such claims generally, it also defeats their claim to a lien on avoidance actions. The UCC defines a "commercial tort claim" broadly, as "a claim arising in tort with respect to which: (A) the claimant is an organization; or (B) the claimant is an individual and the claim (i) arose in the course of the claimant's business or profession; and (ii) does not include damages arising out of personal injury to or the death of an individual." U.C.C. § 9-102(a)(13). "'Arising out of tort' must be construed to cast a broader penumbra than torts alone." *Ins. Co. of N. Am. v. Della Indus., Inc.*, 998 F. Supp. 159, 163 (D. Conn. 1998) (construing pre-2001 version of UCC), *vacated on other grounds*, 229 F.3d 1135 (2d Cir. 1999) (unpublished).[12]

---

[11] This is in contrast to the general rule that for a security interest to attach to property, it is only necessary that the security agreement "provide[] a description of the collateral." U.C.C. § 9-203(b)(3)(A).

[12] A tort is a "civil wrong, other than breach of contract, for which a remedy may be obtained, usually in the form of damages; a breach of a duty that law imposes on persons who stand in a particular relation to one another." *Black's Law Dictionary* 1626 (Deluxe 9th ed. 2009). The concept of a civil wrong "refers to violations of duty imposed by law, common and statutory, as well as willful and wanton and intentional harms." 1 *Modern Tort Law: Liability and Litigation* § 2:1 (2d ed. 2008).

Under this broad definition, commercial tort claims (on which the JSNs have no liens) include avoidance actions, veil piercing claims, and more. *See, e.g.*, *Cent. Vt. Pub. Serv. Corp. v. Herbert*, 341 F.3d 186, 192 (2d Cir. 2003) (describing alter ego as a tort claim); *UFCW Local 174 Commercial Health Care Fund v. Homestead Meadows Foods Corp.*, No. 05 Civ. 7098, (DLC) 2005 WL 2875313, *2 (S.D.N.Y. Nov. 1, 2005) (fraudulent conveyance is a tort); *Sunrise Indus. Joint Venture v. Ditric Optics, Inc.*, 873 F. Supp. 765, 770 (E.D.N.Y. 1995) (same); *see also Tow v. Rafizadeh (In re Cyrus II P'ship)*, 413 B.R. 609, 619 (S.D. Tex. 2008) (holding that avoidance actions are appropriately characterized as tort actions); *S.E.C. v. Infinity Grp. Co.*, 27 F. Supp. 2d 559, 564 (E.D. Pa. 1998) (classifying fraudulent conveyance actions as torts). It is equally clear that the claimants (*i.e.*, the Debtors) are "organizations" and the claims "arose in the course of the claimant's business." Thus, the ninth counterclaim, which seeks a lien on avoidance causes of action, and the seventh counterclaim, which seeks a lien on avoidance causes of action and commercial tort claims, should both be dismissed.

## II. COUNTERCLAIMS 22-25, CLAIMING A LIEN ON CERTAIN ASSETS DESPITE THE ACKNOWLEDGED RELEASES OF THOSE LIENS, SHOULD BE DISMISSED AS A MATTER OF LAW.

The JSNs challenge the legal effect of their own collateral agent's release of the JSNs' liens on a variety of significant assets that had been pledged by various Debtor Obligors, arguing that the releases violated the JSN Indenture or the JSN Pledge Agreement or, in the alternative, that they are entitled to an "equitable lien" on either the subject property or on other unencumbered property of the Debtors. (JSNs' Counterclaims ¶¶ 64-68, 177-85, 192.) The JSNs are wrong in every respect. Even if the JSNs could succeed in proving that the Collateral Agent breached the JSN Indenture and the JSN Pledge Agreement by executing the releases—

which, as the Examiner has already concluded, they cannot—the JSNs cannot prevail on their claims as a matter of law.[13]

### A. The Collateral Agent's Releases and UCC-3 Filings Should Be Enforced.

The JSNs do not dispute that Wells Fargo, in its capacity as Collateral Agent for the JSNs:  (1) executed releases that, as written, terminated the JSNs' security interest in the disputed collateral that was often subsequently re-pledged in connection with another secured financing or otherwise disposed; and (2) filed UCC-3 amendments to their existing financing statements that removed the method by which the JSNs' original liens had been perfected with respect to the disputed collateral.  Those concessions doom their counterclaims.

Although the JSNs allege that the Collateral Agent's releases of the JSNs' liens breached the JSN Indenture and the JSN Pledge Agreement (an assertion Plaintiffs dispute), they never explain how that allegation gives rise to any right to relief *from the Debtors*.  As a matter of logic, the JSNs' remedy, if any, lies in a claim against the Collateral Agent, not in a claim against the Debtors seeking to invalidate the release of such liens.  *See, e.g., Ackoff-Ortega v. Windswept Pac. Entm't Co., Inc.*, 120 F. Supp. 2d 273 (S.D.N.Y. 2000) (dismissing claim on the grounds that it was barred by a release even where the release allegedly was improperly signed by agent of releasor) (citing *Cory v. Nintendo of Am., Inc.*, 185 A.D. 2d 70, 592 N.Y.S. 2d 6, 8 (1st Dep't 1993) ("That the releases were signed, without [ the principal's] knowledge, by his agent . . . does not affect the efficacy of these instruments to bind [the principal].")); *James McKinney & Son, Inc. v. Lake Placid 1980 Olympic Games, Inc.*, 92 A.D.2d 991, 992, 461 N.Y.S.2d 483, 485 (3d Dep't 1983) (enforcing release of all claims arising out of a construction contract even where

---

[13] As the Amended Complaint explains, the JSNs' liens were properly released by the Collateral Agent, who executed broad releases and also filed several UCC Financing Statement Amendments reflecting that certain collateral had been "deleted" and "released" (collectively, the "UCC-3s").

the release allegedly was improperly signed by principal obligor's surety, and rejecting principal's assertion that the release "lacks efficacy").  In short, even if the JSNs' arguments that the releases were improper had merit (which they do not), those arguments would not result in the invalidity or ineffectiveness of the releases, which should be enforced in accordance with their plain terms.

In addition, notwithstanding the JSNs' arguments, UCC-3 statements filed by the Collateral Agent were effective under Article 9 of the UCC in removing the method by which the JSNs' liens on certain categories of assets previously had been perfected.  UCC section 9-510(a) provides that a "filed record is effective only to the extent that it was filed by a person that may file it under section 9-509."  U.C.C. § 9-510(a).  Section 9-509(d), in turn, provides that a "person may file an amendment . . . only if . . . the secured party of record authorizes the filing." U.C.C. § 9-509(d).

To be sure, Sections 9-509 and 9-510 require that, for an amendment to be effective, it must be filed by a person with authority to do so, but the JSNs cannot credibly allege that the Collateral Agent lacked such authority under Article 9.  In their counterclaims, the JSNs acknowledge that all of the UCC-3s were filed by Wells Fargo, as Collateral Agent (JSNs' Counterclaims ¶ 64), and those UCC-3s, copies of which are annexed to this motion, indicate that Wells Fargo was the secured party of record for purposes of the UCC.  (*See, e.g.*, Ex. 1; *see also* Am. Compl. Exs. 5-6.)  In that respect, the UCC-3s are consistent both with the original financing statements that they amended and with the JSN Pledge Agreement's definition of the secured party.  In each, Wells Fargo is defined as the secured party.  *Compare* Am. Compl., Ex. 5 (UCC-3s) *with* Ex. 1 (original financing statement listing Wells Fargo as secured party); *see*

Pledge Agreement, § 2, at 13 (granting "to the Third Party Collateral Agent"—or Wells Fargo—the security interests at issue).

Thus, the UCC-3s removing the method by which the JSNs' liens had been perfected must be given effect, notwithstanding the JSNs' arguments that the releases somehow breached the JSN Indenture. This is the clear instruction of Article 9, which contains only one test for effectiveness of a financing statement (*i.e.*, that it must be filed by a person with authority to do so) and provides no relief for mistake, inadvertence, or breach of the indenture. Courts have therefore given effect to UCC-3s filed by a secured party, even where the party alleges that the statements were filed erroneously. *See, e.g., Crestar Bank v. Neal (In re Kitchin Equip. Co. of Va., Inc.)*, 960 F.2d 1242 (4th Cir. 1992) (finding claimant's security interest extinguished where secured party filed a financing statement and checked, by error, the "TERMINATION" box); *Koehring Co. v. Nolden (In re Pacific Trencher & Equip., Inc.)*, 27 B.R. 167 (B.A.P. 9th Cir. 1983) (holding that claimant's "prior U.C.C. filings [perfecting security interests] lost even marginal sufficiency on [secured party claimant's] filing of termination statement, albeit erroneous[ly], and that in turn effected a lapse in perfection without regard to other parties' knowledge of the security interests."), *aff'd* 735 F.2d 362 (9th Cir. 1984); *Ward v. Bank of Granite (In re Hickory Printing Group, Inc.)*, 479 B.R. 388, 398 (Bankr. W.D.N.C. 2012) (holding that, as "a matter of law, even if mistaken, the Termination Statement was legally effective" where the secured party of record authorized its filing); *In re Hampton*, No. 99-60376, 2001 Bankr. LEXIS 2060 (Bankr. M.D. Ga. Jan. 2, 2001) (holding that a termination statement that was "filed in error" but signed by a secured party was effective to terminate the secured party's lien on the subject collateral); *In re Silvernail Mirror & Glass, Inc.*, 142 B.R. 987, 989 (Bankr. M.D. Fla. 1992) (finding claimant's security interest "unambiguously terminated" where

the secured party filed a termination statement); *Rock Hill National Bank v. York Chem. Indus., Inc. (In re York Chem. Indus., Inc.)*, 30 B.R. 583, 586 (Bankr. D. S.C. 1983) (denying claimant's request to reinstate security interest where secured party's employee sent the original financing statement to the Secretary of State requesting that it be terminated—"albeit unintentionally and inadvertently").[14]

Accordingly, the JSNs' challenge to the validity of the lien releases fails as a matter of law.

### B.  Even if the Liens Were Improperly Released by the Collateral Agent, the JSNs Still Do Not Have a Properly Perfected Equitable Lien.

As an alternative, the JSNs seek a declaration that they have equitable liens on the assets subject to the lien releases.  Here, too, they are wrong as a matter of law.

The JSNs do not even allege facts that would satisfy their burden of establishing that an equitable lien does in fact exist.  *See In re Sneijder*, 407 B.R. 46, 55 (S.D.N.Y. 2009) (Glenn, J.) (it is the creditor's burden to establish the "validity, priority, and extent" of its liens) (citation and internal quotations omitted).[15]  Equitable liens are never automatically perfected, but require some affirmative act to perfect them.  *See Gaffney v. United States DOT (In re Premier Airways, Inc.)*, No. 02-1238 B, 2004 Bankr. LEXIS 5, at *10 (Bankr. W.D.N.Y. Jan. 6, 2004) ("Because the FAA never perfected its interest as a matter of record, the trustee may also avoid any equitable lien or other claim by the FAA to the expansion properties."); *M&T Mortg. Corp. v.*

---

[14] This is not in any way to suggest that the Collateral Agent erred in filing the UCC-3s, or was mistaken about the effect of their filings.  The salient point from the cited authorities, though, is that once a UCC-3 is filed by someone with authority to do so, the statement is effective—period.

[15] Although *Sneijder* arises in a Section 506(a) context, the same burden of proof applies in adversary proceedings.  *See In re Pandeff*, 201 B.R. 865, 870 (S.D.N.Y. 1996) (explaining that in an adversary proceeding, the burden of proof is on the creditor "to prove the validity of its lien") (citations omitted).

*Trosky (In re Trosky)*, 371 B.R. 701, 705 n. 7 (Bankr. M.D. Pa. 2006) ("As such, the Court deems M&T's interest to be equitable in that they retained the right to go to court and reinstate their mortgage but until they did so their interest was merely an unperfected interest with the option of reinstating perfection through litigation."). The JSNs do not plead that they recorded and perfected their alleged equitable lien. Their silence speaks loudly: in fact, the JSNs have never obtained a judgment that they are entitled to an equitable lien, and certainly have not recorded any such alleged equitable liens.

The JSNs' inability to allege that they recorded and perfected their purported equitable liens dooms their claim. The requirement that the JSNs record and perfect their purported equitable liens is the cornerstone of the UCC's "notice filing" regime:

> This section adopts the system of "notice filing." . . . What is required to be filed is . . . only a simple record providing a limited amount of information (financing statement).
>
> The notice itself indicates merely that a person may have a security interest in the collateral indicated. Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs.

*Id*. Allowing the JSNs to have an equitable security interest where they did not record and perfect one would be materially misleading to a potential creditor relying on public records indicating that the JSNs' liens were released. *See In re Hickory Printing Group, Inc.*, 479 B.R. at 397 ("Lenders are bound by the effects of UCC termination statements, even when such termination statements are filed in error, because the entire purpose of the UCC system is to provide public notice of secured interests without requiring parties to look behind or beyond the four corners of the public filing.") (citation omitted); *see also In re Silvernail Mirror & Glass, Inc.*, 142 B.R. at 989 (explaining that setting aside a termination statement should not be done, as it would be "materially misleading" to a potential creditor relying on public records).

Even assuming, purely for argument's sake, that the JSNs have the equitable liens they

seek, any such liens would be junior to perfected liens, such as those held by AFI, and avoidable

by the Debtors, due to the JSNs' failure to perfect the claimed liens. First, the JSNs assert that

most if not all of the collateral that was released from the JSNs' liens was re-pledged shortly

thereafter to the AFI LOC. (*See* JSNs' Counterclaims ¶ 65.) Thus, AFI's properly perfected

liens would have senior priority over any of the JSNs' purported equitable liens.

Second, even if the collateral were not re-pledged to the AFI LOC after the JSNs' liens

were terminated, any equitable liens that may be held by the JSNs similarly are trumped by the

Debtors' avoidance powers. A Chapter 11 debtor-in-possession has the powers of a bankruptcy

trustee pursuant to section 1107(a) of the Bankruptcy Code, including the avoiding power of a

lien creditor pursuant to section 544(a) of the Bankruptcy Code. *See, e.g., Cal. Chieftan v. Air

Vt. Inc. (In re Air Vt., Inc.)*, 761 F.2d 130, 131 (2d Cir. 1985) ("[T]he debtor-in-possession, or

the trustee, becomes a hypothetical lien creditor who may avoid an unperfected security

interest.").[16]

And as a hypothetical lien creditor, a debtor-in-possession has the rights of a creditor

with a judicial lien on property of the estate as of the petition date. *See Togut v. Wapnick (In re

Karachi Cab Corp.)*, 21 B.R. 822, 825 (Bankr. S.D.N.Y. 1982) ("The practical effect of section

_____

[16] *See also Big Yank Corp. v. Bank One Lexington, N.A. (In re Water Valley Finishing, Inc.)*, 170
B.R. 831, 837 (Bankr. S.D.N.Y. 1994) ("Therefore, as it is well settled that a debtor in possession,
standing in the shoes of a [bona fide purchaser] of real property, may avoid an unperfected equitable or
unrecorded mortgage pursuant to § 544(a)(3), the Debtor could avoid Bank One's equitable mortgage
under § 544(a)(3).") (internal citations omitted); *Barr v. Juniata Valley Bank (In re De Lancey)*, 77 B.R.
424 (Bankr. S.D.N.Y. 1987) (denying claimant's summary judgment motion where, the trustee, as a
hypothetical judgment lien creditor, may set aside claimant's inchoate or conditional lien, which was
never perfected against the debtor or his property); *Hassett v. Revlon, Inc. (In re O.P.M. Leasing Servs.,
Inc.)*, 23 B.R. 104, 120 (Bankr. S.D.N.Y. 1982) ("The legislative history of the Bankruptcy Code makes
clear that Article 9 of the U.C.C. treats equitable liens as unperfected security interests which the trustee
can in any case set aside . . . . The U.C.C. also specifically states this principle.") (internal quotations and
citations omitted), *rev'd on other grounds*, 48 B.R. 824 (S.D.N.Y. 1985).

544(a) is to give the trustee all the rights which a hypothetical creditor would have on the property regardless of whether the creditor actually exists.").  Because equitable liens are not automatically perfected, an equitable lien is junior to a judicial lien.  *See, e.g.*, *Rosenbaum v. Century Indem. Co. (In re Ultimite Corp.)*, 168 F.2d 917, 918 (2d Cir. 1948) ("Any rights which the surety company had were based upon an equitable lien.  Such rights by the New York law are deferred to legal liens obtained upon the property by judgment-creditors and trustees in bankruptcy.").[17]  Thus, as a hypothetical lien creditor, a debtor-in-possession has priority over claimants with unperfected security interests.  *Id.* (holding that the "trustee in bankruptcy as a hypothetical lien creditor … has priority over the unsecured [as a result of being unperfected] defendant with respect to the collateral.").

As a matter of law, therefore, the JSNs' claim that they have properly perfected equitable liens not subject to avoidance fails.  The JSNs allege no facts sufficient to establish that they even have an equitable lien.  Nor can they allege that they recorded any purported equitable liens; consequently, any properly recorded lien has priority over their alleged equitable liens as a matter of law.  The Debtors stand in the shoes of a hypothetical lien creditor, and may avoid the JSNs' claimed equitable liens where, as here, the purported lienholder did not obtain an equitable lien judgment before the petition date or commence an action to impose an equitable lien.

---

[17] *See also In re Trosky*, 371 B.R. at 705 (because an equitable security interest was neither filed nor perfected it was not entitled to priority over conflicting perfected security interests); *Cordaro v. Cordaro*, 18 A.D.2d 774, 775 (N.Y. App. Div. 4th Dep't 1962) ("The lien of the judgment having been perfected prior to the creation of the fund it is superior to the inchoate equitable lien and should be paid first.") (*motion denied* 12 N.Y.2d 1070); *Lis v. City Collector of N.Y.*, 131 Misc. 2d 407, 412 (N.Y. Sup. Ct. 1986) ("Since petitioners' equitable lien was recorded *subsequent* to the perfection of the city's lien, the city has superior rights to the check.") (emphasis in original).

**III.    COUNTERCLAIMS 26-30, CLAIMING THAT THE JSNs ARE ENTITLED TO REIMBURSEMENT FOR EVERY DOLLAR OF CASH COLLATERAL USED, SHOULD BE DISMISSED AS A MATTER OF LAW.**

The ultimate questions of whether and to what extent there has been a diminution in the value of the JSNs' collateral entitling the JSNs to an adequate protection claim are matters of fact that cannot be decided on a motion to dismiss.  In their counterclaims and elsewhere, however, the JSNs contend that every dollar of their Cash Collateral that the Debtors have spent—with their consent pursuant to the AFI/JSN Cash Collateral Order—constitutes a *per se* diminution in value entitling them to a replacement lien in equal amount.  They make this assertion despite the fact that their aggregate collateral position has increased since the Petition Date.  This extreme theory of adequate protection is wrong and should be dismissed as a matter of law.

The AFI/JSN Cash Collateral Order, which the JSNs helped negotiate and agreed to, authorized the Debtors to use Cash Collateral in accordance with both an Initial 20-Week Forecast and subsequent updated forecasts subject to the AFI Lender's approval.  (AFI/JSN Cash Collateral Order ¶¶ 14-15.)  The Court authorized the use of cash collateral to ensure a fully operational business from the Petition Date until the sales were intended to close.  In exchange and in satisfaction of the requirements of sections 362, 363(c)(2), and 364 of the Bankruptcy Code, the JSNs (and other secured parties) were granted "adequate protection of their interests in the Prepetition Collateral, including Cash Collateral, *in an amount equal to the aggregate diminution in value of the Prepetition Collateral* to the extent of their interests therein." (AFI/JSN Cash Collateral Order ¶ 16 (emphasis added).)  This language could not be clearer: the JSNs are entitled to an adequate protection claim only to the extent they can demonstrate that

their *aggregate* collateral has diminished in value, and then only for the amount of that diminution.[18]

Thus, while valuation inevitably involves some complexity and room for disagreement, the general framework for measuring diminution in value under the AFI/JSN Cash Collateral Order is simple: determine the total value of the collateral (cash and non-cash) at the outset of the bankruptcy cases, and compare that number to the total value of the collateral at the projected effective date of the Plan. This approach is dictated not only by the language of the AFI/JSN Cash Collateral Order but also by governing law: "[F]or purposes of adequate protection, the value of the collateral is to be determined either as of the petition date or as of the date on which the request for adequate protection was first made." 4 *Collier on Bankruptcy* ¶ 506.03[7][a][iv]. In this case, because agreement on adequate protection was reached as of the Petition Date, that is the relevant measuring point. That initial valuation is then compared against one or more "valuations at different points in the proceedings" to determine whether there has been a change. *Id.*

In advancing their "dollar for dollar" theory, the JSNs apparently seek to have the value of their Cash Collateral measured independently from any increase in their non-cash collateral— an increase facilitated, not coincidentally, through the expenditure of cash. Putting aside the fact that the JSNs' Cash Collateral has actually increased substantially since the Petition Date as the result of asset sales and wind-downs, the JSNs' position finds no support in the law. Courts consistently hold that the use of cash collateral does not give rise to a diminution in value claim

---

[18] It bears noting that the JSNs will bear the burden of proof in establishing diminution in value. *See* 11 U.S.C. § 363(p)(2) (providing that any entity asserting an interest under section 363 "has the burden of proof on the issue of the validity, priority, or extent of such interest"); *Qmect, Inc. v. Burlingame Capital Partners II, L.P.*, 373 B.R. 682, 690 (N.D. Cal. 2007) (secured creditors are not entitled to foreclose on replacement liens absent proof that collateral has diminished in value as a result of the automatic stay or the collateral's use during the pendency of a bankruptcy petition).

so long as there is an equal or greater increase in non-cash collateral.  *See, e.g.*, *Hartigan v. Pine Lake Vill. Apartment Co. (In re Pine Lake Vill. Apartment Co.)*, 16 B.R. 750, 756 (Bankr. S.D.N.Y. 1982) (application of cash collateral to maintain and repair the underlying collateral "clearly ensures that the [secured creditor's] investment is adequately protected."); *Stein v. U.S. Farmers Home Admin. (In re Stein)*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (lienholder's interest in its collateral is not diminished where cash expenditures made by debtor out of cash collateral enhance the overall value of the collateral); *see also In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a secured creditor's interest in its collateral was adequately protected when cash collateral was used to pay necessary operating expenses, and would preserve the overall value of the collateral); *In re Pine Lake Vill. Apartment Co.*, 19 B.R. 819, 826 (Bankr. S.D.N.Y. 1982) ("use of collateral to the extent necessary to preserve or enhance the value of the collateral represents no impairment.").  The rationale for this rule is that the use of cash collateral enhances the value of the total collateral, benefitting the secured lender.[19]  The JSNs' "dollar for dollar" theory ignores this well-established law, and instead seeks a new paradigm in which the secured creditor is entitled to all of the value that has been or will be generated from its collateral, while forcing unsecured creditors to pay all of the expenses associated with operating the business and running the bankruptcy case.

The JSNs further contend that the Debtors' use of their Cash Collateral without dollar-for-dollar reimbursement, even for purposes directly related to maximizing the value of their non-cash collateral, constitutes a surcharge under section 506(c) of the Bankruptcy Code, in

---

[19] Conversely, if unencumbered funds had been used for these purposes—or if the secured lender were subsequently reimbursed for the use of cash collateral, as the JSNs seek here—unsecured creditors would have funded the enhancements to the secured lender's collateral, a wholly inequitable result that is contrary to both the letter and spirit of the adequate protection requirement.  It would be unjust to compensate the secured creditor, in the context of adequate protection, for a supposed diminution in value that actually preserved or increased the value of its collateral.

violation of the Debtors' section 506(c) waiver in the DIP Order. (AFI/JSN Cash Collateral Order ¶ 22.) This argument ignores the distinction between a section 506(c) surcharge and the fundamental principle that adequate protection may arise only when there has been an actual diminution in value. The Second Circuit has held that a debtor may use a secured creditor's collateral to pay administrative expenses where the secured creditor consented to the payment of such expenses. *See In re Blackwood Assocs.*, 153 F.3d 61, 68 (2d Cir. 1998) ("[I]f a secured party consents to allowing such administrative expenses, that party may be liable for such expenses even in the absence of conferred benefit . . ."); *In re 680 Fifth Ave. Assocs.*, 154 B.R. 38, 43 (Bankr. S.D.N.Y. 1993) (debtor may collect expenses from encumbered assets if *either* the secured creditor consents to such expenses (impliedly or expressly) *or* the debtor meets the exception set forth in section 506(c)). There is no question that the Debtors have used Cash Collateral throughout this case; that this use has been authorized by the Court; and that this use has been consented to by the JSNs.[20] There is therefore no need for the Debtors to invoke section 506(c) to gain the right to charge the JSNs' Cash Collateral; that event has already occurred.[21] The only question that remains is whether the JSNs are entitled to adequate protection replacement liens for that use. As shown above, that question depends on whether

---

[20] The JSNs' position that the Debtors may not use Cash Collateral for purposes encompassed within section 506(c) is contradicted by the same DIP order containing the section 506(c) waiver. If every use of the JSNs' Collateral was an impermissible surcharge, then the provisions of the DIP order prohibiting such a surcharge would directly conflict with the provisions allowing the Debtors to use the Cash Collateral. The obviously more logical reading interprets these provisions harmoniously as prohibiting the use of the JSNs' Cash Collateral other than in a manner consistent with the Forecast.

[21] Pursuant to the Revised AFI/JSN Cash Collateral Order, certain expenses that had been accrued but unpaid as of May 14, 2013, as well as expenses incurred after that date, are being paid from unencumbered cash. Importantly, in paragraph 5 of that Revised AFI/JSN Cash Collateral Order, the Debtors have expressly reserved the right to seek to replenish from Cash Collateral all unencumbered funds thus used "as though such expenses had been paid in the first instance from Cash Collateral."

and to what extent there has been a diminution in the value of the JSNs' collateral, which has nothing to do with the section 506(c) waiver.

The distinction between surcharging collateral under section 506(c) and using cash collateral subject to adequate protection pursuant to section 363 is illustrated and explained in *In re ProAlert, LLC*, 314 B.R. 436 (B.A.P. 9th Cir. 2004). In that case, a secured creditor argued that the debtor's use of cash collateral pursuant to a cash collateral order should not be allowed without first considering whether the surcharge requirements of section 506(c) are met. *Id.* at 438-39. The Bankruptcy Appellate Panel for the Ninth Circuit rejected that argument, holding that use of cash collateral could be authorized pursuant to section 363(e) of the Bankruptcy Code, subject to adequate protection, without regard for the requirements for a section 506(c) surcharge. So long as the secured creditor is adequately protected from potential diminution in value, section 506(c) does not come into play.

The *ProAlert* court explained that "§ 506(c) is concerned with an entirely different conflict than that addressed by § 363," and noted the absurdity that would result if a debtor must satisfy section 506(c) in connection with any use of cash collateral:

> [A]doption of [of the secured creditor's] position would give a secured creditor absolute control over the use of cash collateral in most cases, because it would be the rare case where a debtor in possession could satisfy § 506(c)'s onerous burden of proving that each and every expenditure, whether for operational or nonoperational expenses, directly benefitted the secured creditor. Thus, adoption of [the secured creditor's] position would make a successful reorganization subject to the good will of a debtor's secured creditors. Allowing a secured creditor such control would shift the balance carefully struck by Congress and be unduly cumbersome to implement.

*Id. See also In re 499 W. Warren St. Assocs., LTD. P'ship*, 142 B.R. 53, 58 (Bankr. N.D.N.Y. 1992) (surcharging administrative expenses under Section 506(c) is an alternative to use of cash collateral pursuant to section 363(e)); *In re Gen. Auto Bldg., LLC*, 2012 Bankr. LEXIS 5931, *3

(Bankr. D. Or. Dec. 28, 2012) (same); *In re Coventry Commons Assocs.*, 149 B.R. 109, 114 (Bankr. E.D. Mich. 1992) (same); *In re KNM Roswell Ltd. P'ship*, 126 B.R. 548, 557 (Bankr. N.D. Ill. 1991) (section 506(c) surcharge is an exception to the requirements for the contested use of cash collateral under section 363).

Accordingly, the JSNs' twenty-seventh counterclaim should be dismissed in its entirety, and those parts of the twenty-sixth and twenty-eighth through thirtieth counterclaims that are premised on the JSNs' contention that the use of Cash Collateral is an impermissible surcharge, should be dismissed.

## IV. COUNTERCLAIMS 5 AND 6, CLAIMING A RIGHT TO POSTPETITION INTEREST AT THE CONTRACTUAL DEFAULT RATE, SHOULD BE DISMISSED AS A MATTER OF LAW.

The JSNs' fifth and sixth counterclaims seek a declaration that, to the extent they are oversecured and entitled to postpetition interest, such interest should be calculated at the default rate under the Indenture. This request is contrary to the uniform policy of courts within this Circuit that, as a matter of equity, even putatively oversecured creditors should not receive default interest when debtors are insolvent and the default increment would come at the expense of unsecured creditors.

In awarding postpetition interest under section 506(b), bankruptcy courts within the Second Circuit routinely consider whether an oversecured creditor's entitlement to interest should be adjusted downward from the contract's default rate "based on equitable considerations." *In re 785 Partners LLC*, 470 B.R. 126, 134 (S.D.N.Y. 2012). Such an adjustment is regularly deemed appropriate where the "application of the contractual interest rate would harm the unsecured creditors." *Id.*; *see also In re Bownetree, LLC*, No. 1-08-45854-dem., 2009 WL 2226107, at *4 (Bankr. E.D.N.Y. July 24, 2009) (considering "the relative distribution rights of other creditors and whether enforcement of the higher rate will do injustice to the

concept of equitable distribution of the estate's assets" in determining whether to award default interest); *In re Northwest Airlines Corp.*, No. 05-17930 (ALG), 2007 WL 3376895, at *6 (Bankr. S.D.N.Y. Nov. 9, 2007) (declining to award default interest where "there is no question as to the insolvency of the Debtors and the fact that the recovery of other creditors would be diminished by a grant of default interest"); *In re Vest Assocs.*, 217 B.R. 696, 703 (S.D.N.Y. Bankr. 1998) (finding default interest should not be awarded absent an affirmative showing of solvency); *cf. Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 165-66 (1946) (denying interest on interest to first mortgage bondholders in equity receivership where payment of such interest would have reduced recoveries to subordinate creditors). Indeed, Plaintiffs have not located a single published decision within the Second Circuit granting default interest where the debtor was insolvent.

Here, the JSNs acknowledge the Debtors' insolvency (*see* JSNs Counterclaims ¶ 80), and it is wholly undisputed that any default interest to the JSNs would come out of the unsecured creditors' pockets. Because courts in the Second Circuit uniformly hold that oversecured creditors are not entitled to default interest where, as here, the debtors are insolvent and the default interest costs would be borne by the unsecured creditors, the JSNs' fifth and sixth counterclaims should be dismissed.

ny-1099321

# CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court dismiss the following

counterclaims asserted by the JSNs: 5-6, 7, 9, 22-25, and 26-30. Each of these counterclaims

can be dismissed as a matter of law, even assuming the facts as the JSNs have alleged them.

Dated: July 16, 2013

MORRISON & FOERSTER LLP

/s/ Gary S. Lee
Gary S. Lee
Todd M. Goren
Jamie A. Levitt
Samantha Martin
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

-and-

CURTIS, MALLET-PREVOST, COLT
& MOSLE LLP

/s/ Steven J. Reisman
Steven J. Reisman
Theresa A. Foudy
Michael Moscato
101 Park Avenue
New York, New York 10178
Telephone: (212) 696-8860
Facsimile: (212) 697-1559

*Counsel to the Debtors and
Debtors in Possession*

KRAMER LEVIN NAFTALIS
& FRANKEL LLP

/s/ Kenneth H. Eckstein
Kenneth H. Eckstein
Gregory A. Horowitz
Douglas H. Mannal
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

-and-

PACHULSKI STANG ZIEHL
& JONES LLP

/s/ Robert J. Feinstein
Robert J. Feinstein
John A. Morris
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: (212) 561-7700
Facsimile: (212) 561-7777

*Counsel to the Official Committee of
Unsecured Creditors*

ny-1099321